**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| XAVIER D. ROWE, | |
| Plaintiff, | Case No. 17-cv-9258 |
| v. | |
| DAVID SHULKIN, Secretary of the United States Department of Veterans Affairs, | Judge John Robert Blakey |
| Defendant. | |

## MEMORANDUM OPINION AND ORDER

Plaintiff Xavier Rowe sues his employer, the Department of Veterans Affairs (Defendant, or VA), alleging: (1) disability discrimination under The Rehabilitation Act of 1973, 29 U.S.C. § 794, (Count I); (2) retaliation under Title VII, 42 U.S.C. § 2000e, *et seq.*, (Count II); and (3) discrimination based upon race under Title VII (Count III). [1]. Defendant moves for summary judgment. [25]. For the reasons explained below, this Court grants Defendant's motion.

## I. Background

### A. Local Rule 56.1 and Evidentiary Rules

The following facts come from Defendant's Local Rule 56.1 statement of material facts, [27], Plaintiff's response to Defendant's statement of material facts,

[36] at 1−27,[1] Plaintiff's statement of additional facts, [36] at 27−33, and Defendant's response to Plaintiff's statement of additional facts, [41].  Plaintiff's response to Defendant's statement of facts and statement of additional facts, [36], raise multiple evidentiary issues that this Court addresses before turning to the facts themselves.

### 1.    Defendant's Resume & Interview Score Sheets

The parties spend considerable time debating the admissibility of certain resume and interview score sheets (score sheets) submitted by Defendant as exhibits. *See* [27-2] (Exhibits 5A, 5B, 30A, 32, 34).[2]  Defendant cites to the score sheets—as well as to declarations referencing them—in its statement of facts.  *See, e.g.*, [27] ¶¶ 46−47, 51−55.  Plaintiff denies those statements that cite to the score sheets—both directly and indirectly—because, according to Plaintiff, the score sheets constitute improper summary exhibits under Federal Rule of Evidence 1006.[3]  *See* [36] (Plaintiff's response) ¶¶ 46−47, 51−55.  Specifically, Plaintiff argues that the score sheets are inadmissible summaries because Defendant failed to produce the underlying documents used to create them, and because the score sheets fail to identify: (1) the scorer; (2) what the scores represent; (3) the actual method of scoring used; or (4) how Defendant calculated the scores listed on the score sheets.  *Id.*; [35] at 10−12.

---

[1] Plaintiff submitted his response to Defendant's statement of material facts and his own statement of additional facts within the same docket number.  *See* [36].  Unless otherwise noted, all cites to [36] in this opinion refer to Plaintiff's statement of additional facts.

[2] Both parties filed all of their exhibits under a single docket number.  To prevent confusion when citing to an exhibit, this Court will clarify both the docket number and the individual exhibit.

[3] Plaintiff repeatedly cites to "Fed. R. Civ. P. § 1006."  *See, e.g.*, [35] at 11; [36] (Plaintiff's response) ¶ 46.  Because such a rule does not exist, this Court assumes that Plaintiff meant Fed. R. Evid. 1006.

This Court rejects Plaintiff's argument, because Defendant does not seek to offer the resume and interview score sheets as summaries of other records created for litigation purposes, as Rule 1006 contemplates; instead, Defendant created them as business records, and they are admissible as such under Fed R. Evid. 803(6). The declarations of Chief Gary Marsh, Deputy Chief Edward Jones, and Security Specialist Aaron Gatterdam provide foundation and authentication for the score sheets, and establish (among other things) that Defendant created them at or near the time of the resume reviews and interviews. [27-2] (Exhibit 5) ¶¶ 11−13; [27-2] (Exhibit 12) ¶¶ 8−10; [27-2] (Exhibit 30) ¶ 8. Moreover, VA Human Resources employee Jodi Yenerall confirmed that Defendant created and kept the score sheets as part of its regular promotion practice. [41-2] (Exhibit 52) ¶¶ 2−5. Accordingly, this Court finds the resume and interview score sheets, [27-2] (Exhibits 5A, 5B, 30A, 32, 34), admissible for purposes of this opinion.

## 2.    Plaintiff's Undisclosed Exhibits

Plaintiff's additional statements of facts rely, in part, upon several documents created or produced in a separate, unrelated case—*Henderson v. Shulkin*—that Plaintiff's counsel litigated against Defendant. *See* [36-1] (Exhibits 12−14, 18, 25−26). Plaintiff never disclosed or produced these exhibits to Defendant in this case prior to including them in his statement of additional facts. [40] at 4. Therefore, Defendant argues that he cannot now use them to supply evidence on a summary judgment motion, pursuant to Fed. R. Civ. P. 37(c)(1). This Court agrees.

Under Rule 37(c)(1), if a party fails to "provide information or identify a witness as required by Rule 26(a) or (e)," that party cannot then "use that information or witness to supply evidence on a motion . . . unless the failure was substantially justified or is harmless." *Karum Holdings LLC v. Lowe's Cos.*, 895 F.3d 944, 951 (7th Cir. 2018). Therefore, the "exclusion of nondisclosed evidence is automatic and mandatory under Rule 37(c)(1) unless non-disclosure was justified or harmless." *Id.* (citing *Musser v. Gentiva Health Servs., Inc.*, 356 F.3d 751, 755 (7th Cir. 2004)).

Here, Plaintiff undoubtedly violated Rule 26(e). This rule requires a party "who has made a disclosure under Rule 26(a)—or who has responded to an interrogatory, request for production, or request for admission—" to supplement or correct its disclosure or response in a "timely manner" if:

> the party learns that in some material respect the disclosure or response is incomplete or incorrect, and if the additional or corrective information has not otherwise been made known to the other parties during the discovery process or in writing.

Fed. R. Civ. P. 26(e). In both Plaintiff's Mandatory Initial Discovery Pilot (MIDP) disclosures, [41-2] (Exhibit 53), and responses to Defendant's interrogatories, [41-2] (Exhibit 54), Plaintiff failed to identify or produce any documents relating to the *Henderson* case as relevant to the present case. In fact, when Plaintiff attempted to supplement his MIDP disclosures—as discovery was set to close, and well after the deadline to supplement initial disclosures—to include references to the plaintiff in *Henderson* and his EEO investigation file, this Court excluded that plaintiff as a witness due to the untimely disclosure. [41-2] (Exhibit 55); [19].

And under Rule 37(c)(1), Plaintiff has offered no explanation or justification for his untimely disclosure of the *Henderson* exhibits. *See generally* [35] [36]. Yet, they undoubtedly harm Defendant; Plaintiff relies upon the relevant exhibits throughout his response brief, *see, e.g.*, [35] at 6, 13, and Defendant lost the opportunity to conduct discovery that may have clarified or contradicted these arguments. Moreover, three of the relevant exhibits are declaration affidavits of witnesses that Plaintiff never identified in his initial (or any supplemental) MIDP disclosures. *See, e.g.*, [36-1] (Exhibits 14, 18, 25); [41-2] (Exhibit 53). Accordingly, this Court excludes the following exhibits pursuant to Rule 37(c)(1): [36-1] (Exhibit 12) (Grade 11 Criminal Investigator announcement); [36-1] (Exhibit 13) (Grade 11 Criminal Investigator certificate); [36-1] (Exhibit 14) (Declaration of Cary Kolbe); [36-1] (Exhibit 18) (Declaration of Brian Cross); [36-1] (Exhibit 25) (Affidavit of Donald Barnes); [36-1] (Exhibit 26) (suspension decision letter).

## B.     The Parties

Plaintiff, an African-American veteran, began working for Edwards Hines, Jr. VA Hospital (Hines) in 2003 as a GS-6 level police officer. [27] ¶ 1; [36] ¶ 1. In 2006, under circumstances that neither party clarifies, the VA stripped Plaintiff of his badge and gun and placed him into a janitorial, or housekeeping, role at Hines for more than a year until he "won [his] position back through a lawsuit." [36] ¶ 2; [36-1] (Exhibit 1) ¶ 3. Plaintiff worked at Hines until October 2016, when he requested and received a transfer to a new VA facility near Dallas, Texas. [27] ¶ 2. Plaintiff remains employed at the Dallas VA facility today. *Id.*

In 2013, Gary Marsh took over as Chief of Police at Hines. [27] ¶ 4. From 2014 until August 2016, Deputy Chief Edward Jones served as the second-ranking member of the Hines police department. *Id.* From 1998 to the present, Captain Percy Henderson has worked as the captain in charge of training for Hines police officers. *Id.* ¶ 7. Throughout this time, Henderson has served as the sole Hines police officer officially assigned to a training officer position at Hines. *Id.*; [27-2] (Exhibit 8) ¶ 3.

## C. Plaintiff's Training Responsibilities & Official Designation

Beginning in 2004, Plaintiff began providing training and instruction to his fellow Hines police officers. [27] ¶ 8. Along with Plaintiff, 11 other Hines police officers similarly performed training and instruction between 2004 and 2016. *Id.* In November 2014, Plaintiff began working on training full-time, taking over the full-time training duties from Officer Tylor Whitt. *Id.* ¶ 9. Plaintiff did not formally apply or interview for these new duties, and the VA did not issue a vacancy announcement for a full-time training role. *Id.* Plaintiff performed these training duties for over 52 weeks, and during this time training comprised his primary job function. [36] ¶ 6.

During the time that Plaintiff performed the full-time training role, the VA still officially designated him as a GS-6 police officer. [27] ¶ 3. Plaintiff reported to Lieutenant Joseph Ellena, rather than Captain Henderson—the VA employee in charge of training. *Id.* ¶¶ 3, 10−11. Ellena's performance appraisal of Plaintiff for October 2014 through September 2015 listed Plaintiff as a GS-6 police officer, noting that the VA had detailed Plaintiff to Captain Henderson to perform training duties. [27-2] (Exhibit 10) at 1053, 1060. In June 2015, Plaintiff signed a retention service

agreement stating that he worked as a GS-6 police officer.  [27] ¶ 12; [27-2] (Exhibit 11).

### D.    Hines' SF-52 Practices

The Office of Personnel Management (OPM) instructs federal agencies to issue SF-52 forms when they detail an employee to a position at a higher-grade than that of their current, official position for more than 120 days.  [36] ¶ 8; [36-1] (Exhibit 5) Table 14-A.

At some point in 2015, Plaintiff asked Chief Marsh to provide him with an SF-52 form indicating that he performed the duties of a GS-7 or GS-8 training officer. [27] ¶ 18.  According to Chief Marsh, he did not provide an SF-52 form to Plaintiff because no "training instructor" or "training officer" position—at a grade higher than GS-6—existed at Hines at that time.  [41] ¶ 8; [27-2] (Exhibit 4) at 98.  The parties do not dispute that throughout Chief Marsh's tenure, Hines did not authorize its police force to pay any employee as a GS-7 or GS-8 training officer.  [27] ¶ 13.  On multiple occasions, Chief Marsh did request authorization from Hines' management to add a second training officer position at the GS-7 or GS-8 level, but Hines management declined to do so.  *Id*.; [27-2] (Exhibit 12) ¶¶ 4–5.

Hines did not provide SF-52 forms to the other police officers who, along with Plaintiff, conducted training.  [27] ¶ 21.  In fact, instead of SF-52 forms, Assistant Director Daniel Zomcheck instructed Marsh to give "special contribution awards," or specific monetary awards for performance, to all individuals performing duties above and beyond their assigned positions.  *Id*. ¶ 13; [36-1] (Exhibit 8) at 36.  In April 2018,

however—after Zomcheck left Hines—Marsh did give an SF-52 form to Lieutenant Ellena. [36] ¶ 9; [27-2] (Exhibit 4) at 5, 35. But, Defendant notes that Ellena received an SF-52 for the position of Physical Security Specialist—a position that, unlike the training officer position, Hines officially authorizes. [41] ¶ 9; [41-2] (Exhibit 52).

### E. Hines' Promotion Policy & Special Appointing Authorities

Hines uses a Merit Promotion Policy, which requires hiring individuals to consider eight listed "sources of information" to the extent they relate to the relevant job post. [36] ¶ 10. These sources include: (1) resume; (2) appraisals; (3) supplemental qualifications statement; (4) education; (5) awards; (6) training; (7) outside activities; (8) other tools: interviews, work samples, written tests, etc. *Id.*; [36-1] (Exhibit 4) at 21.

Federal agencies may also use special appointing authorities, or "noncompetitive and excepted service appointing authorities," entirely at their discretion. [27-2] (Exhibit 17) at 8-6. Special authorities applicable to employing veterans include: (1) Veterans' Recruitment Appointment (VRA); (2) 30 Percent or More Disabled Veterans' Authority (30 Percent); (3) Disabled Veterans Enrolled in a VA Training Program Authority; (4) Veterans' Employment Opportunities Act (VEOA); and (5) Schedule A for Persons with Disabilities (Schedule A). [27-2] (Exhibit 24) at 8-7−8-8. The VRA requires that applicants meet the basic qualifications for the relevant position, while 30 Percent requires that applicants meet all of a position's qualification requirements. *Id.* Schedule A serves as an alternative to authorities specifically designed for veterans, and provides a method

for hiring individuals with physical, psychiatric, or cognitive impairments without competition. *Id*. Schedule A requires applicants with disabilities to "be at least minimally qualified to perform the position." *Id*.

Plaintiff qualifies for VRA and Schedule A and has a compensable service-connected disability of 30 percent or more. [36] ¶ 13; [27-2] (Exhibit 17) at 144−45 of 439. Specifically, Plaintiff suffers from sciatic nerve damage and decompression in his hands. [36] ¶ 1; [27-2] (Exhibit 1 at 48−49).

### F.     GS-8 Lieutenant Non-Selection

In May 2016, the VA announced a vacancy for a GS-8 supervisory police officer (lieutenant) position at Hines. [27] ¶ 23; [27-2] (Exhibit 14). The job announcement stated that current federal employee applicants holding a GS grade must meet a time-in-grade requirement of 52 weeks at the GS-7 level to be considered. [27] ¶ 24; [27-2] (Exhibit 14) at 3. The announcement also stated that applicants must have at least one year of specialized experience at or above the GS-7 grade level, or equivalent experience from outside the VA. [27] ¶ 24; [27-2] (Exhibit 14) at 2. And under the heading "Special Employment Consideration," the announcement explained that:

> VA encourages persons with disabilities to apply, including those eligible for hiring under 5 CFR 213.3102(u), Schedule A, Appointment of persons with disabilities [i.e., intellectual disabilities, severe physical disabilities, or psychiatric disabilities], and/or Disabled veterans with a compensable service-connected disability of 30% or more.

[27-2] (Exhibit 14) at 1. Plaintiff applied for the position, and in his application package noted his VRA and Schedule A eligibility, as well as his compensable service-

connected disability of 30 percent or more. [27] ¶ 27; [36] ¶ 13; [27-2] (Exhibit 17) at 144−45 of 439.

Ronald Dusenberry, a VA Human Resources Specialist based in Milwaukee, reviewed the application packets submitted by potential candidates for the lieutenant position. [27] ¶ 25. In doing so, Dusenberry determined whether each applicant met the position's minimal qualifications. *Id*. As part of his review, Dusenberry had access to the applicants' application materials, as well as the ability to verify employment at the necessary grade. *Id*. ¶ 26; [36-1] (Exhibit 6) at 47.

In the questionnaire portion of his application, Plaintiff stated that he held a GS-7 position for 52 weeks, or that his current position constituted a grade above GS-7. [27] ¶ 27. But, Plaintiff also submitted his resume, official personnel file record, and October 2014 through September 2015 performance appraisal, all of which demonstrated that although Hines VA had detailed him to training duties, officially, Plaintiff held only a GS-6 grade level. [27] ¶ 28; [27-2] (Exhibit 17) at 1031, 1042, 1053 [27-2].

Based upon Plaintiff's application materials, Dusenberry determined that Plaintiff failed to meet the required time-in-grade and therefore did not qualify for consideration for the lieutenant position. [27] ¶ 29. Dusenberry then created a certificate of candidate referral for the seven applicants he deemed qualified for the lieutenant position, based upon selection criteria given to him by his supervisors. [27] ¶ 33; [36-1] (Exhibit 6) at 48−52. Specifically, Dusenberry's supervisors instructed him to start by considering only internal Hines employees based upon merit

promotions, rather than any VRA or Schedule A eligible employees.  [36-1] (Exhibit 6) at 49−50.

On May 19, 2016, the VA notified Plaintiff that he failed to meet the required time-in-grade and therefore the VA could not consider him for the position.  [27] ¶¶ 29, 31; [36] ¶ 15.  After Plaintiff received the notice, he contacted Dusenberry, as well as Chief Marsh, Deputy Jones, and Jodi Yenerall—the Hines supervisor for recruitment and placement at that time.  [36] ¶ 15; [36-1] (Exhibit 7) at 7−8.  Plaintiff provided Dusenberry and Yenerall with a chart, via e-mail, showing that the "training officer" position operated as a GS-7 or GS-8 position, and explained that functionally, he had performed the duties of such a training officer for more than 52 weeks.  *Id.*; [36-1] (Exhibit 6) at 59−62; [27-2] (Exhibit 13).[4]  Dusenberry testified that if Plaintiff had obtained an SF-52 form documenting his duties at a higher grade, or if Chief Marsh had sent Dusenberry written confirmation that Plaintiff had performed GS-7 duties for more than 52 weeks over a period of time, this would have sufficed for Plaintiff to meet the time-in-grade requirement.  [36-1] (Exhibit 6) at 55.

When Plaintiff reached out to Dusenberry, Dusenberry informed him that Hines would not consider Schedule A-qualified applicants for the position.  [36] ¶ 15; [36-1] (Exhibit 6) at 49−50.  Plaintiff maintains that Chief Marsh told him Schedule A and VRA applicants would be considered.  [36] ¶ 15; [36-1] (Exhibit 1) ¶¶ 6−8.

Following Plaintiff's e-mail to Dusenberry, Dusenberry received no direction from either his supervisor—Terri Lasota—or Yenerall as to how, if at all, he should

---

[4] Plaintiff testified that he obtained this chart from "police services," but that he cannot remember the specifics of the folder or manual from which he found it.  [27-2] (Exhibit 1) at 100−01.

have incorporated Plaintiff's explanation of his training duties into his application. [36-1] (Exhibit 6) at 62. Instead, Lasota and Yenerall sent back their selections from the certificate for the position. *Id*.

In addition to Plaintiff, the VA rejected five other applicants for failing to meet the time-in-grade requirement. [27] ¶ 32. Two of these applicants are Caucasian, one is African-American, and one is Hispanic. *Id*. And of the seven applicants Dusenberry deemed qualified for the position, two are Caucasian, three are African-American, and one is Hispanic. *Id*. ¶ 34. All seven of these applicants submitted resumes indicating that they had previously spent at least one year at a GS-7 level or higher position. *Id*. ¶ 36. One individual deemed qualified—Eddie Borja—had previously accused Chief Marsh and the VA of racial discrimination in an EEO claim. *Id*. ¶ 35. Ultimately, Chief Marsh selected James Gowdy—an African American male—for the lieutenant position. *Id*. ¶¶ 34, 42. Later, in November 2016, Marsh also promoted Jeromy Backman—a Caucasian male—to lieutenant. *Id*. Both Gowdy and Backman worked as GS-7 police sergeants at Hines at the time they applied for the lieutenant position. *Id*. ¶ 42.

## G.     GS-7 Sergeant Non-Selection

In May 2016, the VA announced a second vacancy for a GS-7 lead police officer, or sergeant, position at Hines. *Id*. ¶ 43. The job announcement stated that current federal employee applicants holding a GS grade must meet a time-in-grade requirement of 52 weeks at the GS-6 level. *Id*. ¶ 44. The announcement also stated that the position required at least one year of specialized experience at the GS-6 level,

or equivalent experience from outside the VA.  *Id*.  Unlike the GS-8 lieutenant job posting, this announcement did not mention VRA, Schedule A, or 30% disabled as factors of consideration.  [36] ¶ 16.

Plaintiff applied to the GS-7 sergeant job posting.  [27] ¶ 45.  After reviewing all applications, the VA deemed Plaintiff, along with nineteen other candidates, minimally qualified for the position.  *Id*.  Rather than interview all nineteen candidates for the position, the VA conducted a resume review in which a panel reviewed the application materials submitted by each applicant and scored the applications to identify the most highly qualified applicants.  *Id*. ¶ 46.  The panel consisted of Deputy Chief Jones, Gatterdam, and Hines Facility and Data Center Manager Edwin Wlodarski.  *Id*. ¶47; [27-1] (Exhibit 5) ¶ 7, (Exhibit 30) ¶ 4, (Exhibit 31) ¶4, (Exhibit 25) ¶ 4.

Yenerall provided the panel members with the resume and application materials of each minimally qualified applicant.  [27] ¶ 46.  The panel members received the application materials with names and other identifying information redacted.  *Id*. ¶ 48.  Plaintiff claims that information such as his disability, training history, and assignments could have revealed his identity.  [36] (Plaintiff's response) ¶ 48.  The parties do not dispute, however, that neither Gatterdam nor Wlodarski knew Plaintiff or anything about his race, disability status, or history of engaging in protected activity.  [27] ¶ 50.

After the resume review panel scored each application, Plaintiff tied for the ninth-highest score of the 19 applicants.  *Id*. ¶ 52; [27-2] (Exhibit 32).  The VA placed

the top six scoring applicants from the resume review on the candidate referral certificate, [27-2] (Exhibit 33), and therefore Plaintiff failed to proceed to the next round of hiring.  [27] ¶ 53.  The VA interviewed these candidates, scored their interviews, and then Chief Marsh added the applicants' interview and resume scores.  *Id.* ¶ 54; [27-2] (Exhibit 12) ¶ 10.  He ultimately selected the candidates with the three highest combined scores for promotion.  [27] ¶ 55; [27-2] (Exhibit 12) ¶ 11; [27-2] (Exhibit 35).  Of the three promoted candidates, two are African-American, and one is Caucasian.  [27] ¶¶ 53, 55.  One of the African-American selectees had previously filed EEO claims and a lawsuit accusing Chief Marsh of discrimination.  *Id.* ¶¶ 55–56.

## H.    Documents Forwarded to Dallas

In October 2016, Plaintiff requested and received a transfer to a new VA facility near Dallas, Texas.  *Id.* ¶ 2.  When a VA employee transfers to a new facility, the VA must send his or her medical records to the employee's new facility.  *Id.* ¶ 57.  According to the VA Director of Occupational Health, VA personnel must wait until the employee has officially transferred before sending the records.  *Id.*  This policy protects the transferring employee by ensuring that the facility he or she transfers to does not learn of any health problems the employee might have until the transfer goes through.  *Id.* ¶ 58.  VA personnel also cannot fax records to the receiving facility; instead, they must physically send the records to prevent "shadow records," or multiple copies of the same medical record.  *Id.* ¶ 59.

On October 7, 2016, Plaintiff gave the VA Health Services Department a note from his surgeon clearing him to work full duty. *Id.* ¶ 60. That same day, the VA cleared Plaintiff for transfer to Dallas from Hines. *Id.* Plaintiff arrived in Dallas that day—October 7, 2016. *Id.*

On October 13, 2016, VA Medical Support Assistant Sharon Brescia noted that she had forwarded Plaintiff's medical file to Dallas. *Id.* ¶ 61. The Dallas VA received Plaintiff's medical records on October 14, 2016. *Id.*

## I. Plaintiff's EEO Claims

Prior to the events at issue in this case, Plaintiff engaged in EEO activity when he filed: (1) an EEO claim and lawsuit against the VA in 2008; and (2) a 2015 EEO claim against Chief Marsh. *See id.* ¶¶ 5–6.

On August 15, 2016, Plaintiff made his initial Equal Employment Opportunity (EEO) contact regarding his non-selection to the GS-8 lieutenant position, his non-selection to the GS-7 sergeant position, and alleged delay in forwarding his documentation to Dallas. *Id.* ¶ 69. With respect to the documentation complaint in particular, Plaintiff claimed that VA Nurse Practitioner Jill Turkoglu should have forwarded his medical records to Dallas in August or September 2016, rather than October 2016. *Id.* ¶ 70.

On October 20, 2016, Plaintiff filed his formal complaint regarding the non-selection to the GS-8 lieutenant position and GS-7 sergeant position, as well as the alleged delay in documentation forwarding. *Id.* ¶ 71.

## II.    Legal Standard

Courts should grant summary judgment when the moving party shows that no genuine dispute exists as to any material fact and the evidence weighs so heavily in the moving party's favor that the moving party "must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986); *see also* Fed. R. Civ. P. 56. A genuine dispute as to a material fact exists when, based upon the evidence, a reasonable jury could find for the non-moving party. *Anderson*, 477 U.S. at 248. To show a genuine dispute as to a material fact, the non-moving party must point to "particular materials in the record," and cannot rely upon the pleadings or speculation. *Olendzki v. Rossi*, 765 F.3d 742, 746 (7th Cir. 2014).

At summary judgment, courts must evaluate evidence in the light most favorable to the non-moving party and refrain from making credibility determinations or weighing evidence. *Rasho v. Elyea*, 856 F.3d 469, 477 (7th Cir. 2017) (citing *Anderson*, 477 U.S. at 255). The moving party bears the burden of establishing the lack of genuine disputes as to any material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

## III.   Analysis

### A.    Plaintiff's Rehabilitation Act Claim

Plaintiff argues that the VA refused to consider him for the GS-8 lieutenant position because of his disability, in violation of the Rehabilitation Act. [35] at 14. Specifically, Plaintiff maintains that once the VA saw that Plaintiff "qualified under the VRA and Schedule A, it decided not to give him or any other disabled applicants

the chance to compete for the GS-8 Lieutenant position." *Id*. Defendant argues that Plaintiff's Rehabilitation Act claim fails because: (1) he cannot show that he meets the Act's definition of "disabled"; and (2) he has no evidence that the VA discriminated against him based upon any disability. [26] at 16. Based upon the record before it, this Court finds that Plaintiff fails to establish disability under the Rehabilitation Act, and thus this Court need not reach Defendant's second argument.

### 1. Plaintiff Cannot Establish Disability

Because Plaintiff brings his disability claim against a federal agency, rather than a private employer, his claims fall under the Rehabilitation Act and not the Americans with Disability Act (ADA). 29 U.S.C. § 794(b)(1). Courts look, however, to the standards applied under the ADA when determining whether a Rehabilitation Act violation has occurred in the employment context. *Steffen v. Donahoe*, 680 F.3d 738, 749 n.1 (7th Cir. 2012) (citing *Peters v. City of Mauston*, 311 F.3d 835, 842 (7th Cir. 2002)); 29 U.S.C. § 794(d). Thus, this Court refers to the Rehabilitation Act and the ADA interchangeably. An ADA violation occurs when a covered entity discriminates against a "qualified individual on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees . . . and other terms, conditions, and privileges of employment." *Steffen*, 680 F.3d at 738 (citing 42 U.S.C. § 12112(a)).

As an initial matter, Plaintiff must show that he meets the ADA's definition of disability. *Id*. at 743. The ADA defines "disability" as: (1) a physical or mental impairment that substantially limits one or more of the major life activities of such

individual; (2) a record of such an impairment; or (3) being regarded as having such an impairment.  42 U.S.C. § 12102(2); *see also id*.  Merely having an impairment does not suffice under the ADA; an individual must show that the impairment substantially limits a major life activity.  *Toyota Motor Mfg., Ky., Inc. v. Williams*, 534 U.S. 184, 195 (2002).

The Equal Employment Opportunity Commission (EEOC) instructs that an impairment "is a disability within the meaning of this section if it substantially limits the ability of an individual to perform a major life activity as compared to most people in the general population."  29 C.F.R. § 1630.2(j)(1) (2019).[5]  A major life activity is one "of central importance to daily life," such as walking, seeing, and hearing.  *Pashnick v. United Parcel Serv.*, No. 09 C 565, 2010 WL 4628523, at *2 (N.D. Ill. Nov. 8, 2010) (citing *Toyota*, 534 U.S. at 197); *see also* 29 C.F.R. § 1630.2(j)(1)(i) (2019) (providing a non-exhaustive list of major life activities, including caring for oneself, performing manual tasks, seeing, hearing, eating, sleeping, walking, standing, reaching, lifting, bending, speaking, breathing, and working).

Plaintiff's disability claim fails because he cannot show that his disability impacts a major life activity under the ADA.  Plaintiff testified that his disability consists of sciatic nerve damage and decompression in his hands.  [27-2] (Exhibit 1) at 48−49.[6]  When asked how his disabilities affected his daily life, Plaintiff responded

---

[5] EEOC regulations are "not binding on this court, [but] such administrative interpretations 'do constitute a body of experience and informed judgment to which courts and litigants may properly resort to guidance.'"  *O'Neal v. City of New Albany*, 293 F.3d 998, 1009 (7th Cir. 2002) (quoting *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 65 (1986)).

[6] Plaintiff also testified that he had been diagnosed with depression, but concedes that the diagnosis occurred in 2017, after he left Hines.  [27-2] (Exhibit 1) at 51−52.

that they "did not prohibit" him from completing his duties at work, but that in his personal life, his disability prevented him from lifting weights "like [he] used to" and running marathons. *Id*. at 50−51. Simply put, this Court cannot conclude that lifting weights and running marathons constitute "major life activities" for purposes of the ADA. *See, e.g.*, *Pashnick*, 2010 WL 4628523, at *3 (N.D. Ill. Nov. 8, 2018) ("Running . . . does not qualify as a major life activity as it is not of central importance to daily life."); *Squibb v. Mem'l Med. Ctr.*, 497 F.3d 775, 782 (7th Cir. 2007) ("We previously have expressed doubt that an inability to lift more than ten pounds, which in turn restricts an individual's employment opportunities in heavy-duty jobs, could constitute a disability within the meaning of the [ADA].") (citing *Mays v. Principi*, 301 F.3d 886, 869−70 (7th Cir. 2002)); *Williams v. Excel Foundry & Mach., Inc.*, 489 F.3d 309, 313 n.2 (7th Cir. 2007) (holding that under the ADA, the "inability to lift more than fifty pounds did not render [plaintiff] disabled."); *Wenzel v. Missouri-American Water Co.*, 404 F.3d 1038, 1041 (8th Cir. 2005) ("A lifting restriction, without more, is not a disability.").

Plaintiff argues that he nonetheless qualifies as disabled because the VA previously classified him as disabled under the VRA and Schedule A. [35] at 13−14. But meeting the VA's standard for a special appointing authority cannot, by itself, establish disability under the Rehabilitation Act, as the eligibility requirements and purposes of the programs differ. *See e.g.*, *Wingfield v. S. Univ. of Florida, Inc.*, No. 09 C 1090, 2010 WL 2465189, at *7 (M.D. Fla. June 15, 2010) ("[T]he VA's disability rating apparently accounts for loss of earning capacity and involves a completely

different inquiry than the one the Court must perform" in an ADA inquiry) (internal citations omitted); *Thorn v. BAE Sys. Haw. Shipyards*, 586 F. Supp. 2d 1213, 1222 (D. Haw. 2008) ("A VA disability rating – based on quantifying a decrease in a veteran's earning capacity – is a completely different inquiry and standard than that imposed by the ADA . . . of whether a claimant's impairment substantially limits a major life activity").

Aside from lifting weights and running marathons, Plaintiff offers no explanation, medical records, or other evidence as to how his disability affects any major life activity. [27-2] (Exhibit 17) at 144−45 of 439. Therefore, in the absence of additional facts, this Court cannot find that Plaintiff's VRA or Schedule A status, by itself, creates a genuine issue of fact as to Plaintiff's disability under the ADA.

Alternatively, the ADA's definition of "disability" also includes "being regarded as having such an impairment." 42 U.S.C. § 12102(2). But, under the "regarded as" prong, "the employer must believe . . . that the employee has an impairment that substantially limits one or more major life activities." *Powers v. USF Holland*, 667 F.3d 815, 823 (7th Cir. 2011). Here, Plaintiff fails to argue or put forth any evidence to support a finding that any VA employee regarded him as having an impairment that substantially limits a major life activity. Instead, the record shows only that the VA knew Plaintiff fell under the VRA and Schedule A. [27] ¶ 27; [36] ¶ 13; [27-2] (Exhibit 17) at 144−45 of 439. Based upon this record, this Court cannot find that Plaintiff meets the ADA's definition of disability under the "regarded as" prong.

Accordingly, Defendant's motion for summary judgment is granted as to Plaintiff's Rehabilitation Act claim (Count I).

## B.     Plaintiff's Race-Based Title VII Claim

Plaintiff claims that the VA discriminated against him based upon race, in violation of Title VII, when he applied for both the GS-8 lieutenant position and GS-7 sergeant position.  [1] ¶¶ 67−70.   This Court analyzes each promotion process in turn.

When analyzing Title VII race-based claims on summary judgment, courts ask "whether the evidence would permit a reasonable factfinder to conclude" that the plaintiff's race "caused the discharge or other adverse employment action"—here, the failure to promote.  *Ortiz v. Werner Enters., Inc.*, 834 F.3d 760, 765 (7th Cir. 2016).  Courts must consider the evidence "as a whole, rather than asking whether any particular piece of evidence proves the case by itself—or whether just the 'direct' evidence does so, or the 'indirect' evidence."  *Id.*  This holistic analysis, set forth in *Ortiz*, supplements, rather than alters, the burden-shifting framework for discrimination claims that the Seventh Circuit created in *McDonnell Douglas Corporation v. Green*, 411 U.S. 792, 793 (1973).  *See Skiba v. Ill. Cent. R.R. Co.*, 884 F.3d 708, 719−20 (7th Cir. 2018); *David v. Bd. of Trs. of Cmty. Coll. Dist. No. 508*, 846 F.3d 216, 224 (7th Cir. 2017).  As a result, courts addressing discrimination claims now conduct the *McDonnell Douglas* analysis if the parties present arguments "in those terms," but also assess the plaintiff's evidence "cumulatively" under *Ortiz*.  *David*, 846 F.3d at 224.  Because both parties employ the *McDonnell Douglas*

structure, this Court will assess Plaintiff's evidence in those terms, as well as under *Ortiz*'s holistic approach. *See id.*; *Mirocha v. Palos Cmty. Hosp.*, 240 F. Supp. 3d 822, 837 (N.D. Ill. 2017).

To demonstrate a prima facie case under *McDonnell Douglas* for failure to promote, a plaintiff must provide evidence showing that: (1) he belongs to a protected class; (2) he was qualified for the position sought; (3) he was rejected for the position; and (4) the employer promoted someone outside of the protected class who was not better qualified for the position, or who had similar or lesser qualifications. *Riley v. Elkhart Cmty. Sch.*, 829 F.3d 886, 892 (7th Cir. 2016); *Whitfield v. Int'l Truck & Engine Corp.*, 755 F.3d 438, 444 (7th Cir. 2014); *Pafford v. Herman*, 148 F.3d 658, 669 (7th Cir. 1998). Once a plaintiff establishes a prima facie case, the burden shifts to the employer to offer a legitimate, non-discriminatory reason for the employer's decision. *Peele v. Country Mut. Ins. Co.*, 288 F.3d 319, 326 (7th Cir. 2002). If the employer does so, the employer merits summary judgment "unless the plaintiff presents evidence that the proffered reasons are pretexts for discrimination." *Collier v. Budd Co.*, 66 F.3d 886, 889 (7th Cir. 1995).

### 1.     GS-8 Lieutenant Non-Selection

Defendant contends that Plaintiff cannot establish the second and fourth elements of a prima facie case for his GS-8 lieutenant claim. [26] at 6−7. It also argues that even if Plaintiff could establish a prima facie case, he cannot show that the VA's proffered reason for his non-selection—that Plaintiff lacked the required

experience—serves as pretext for discrimination. *Id.*[7] For the reasons explained below, this Court agrees.

### a. Second Element & Pretext: Plaintiff's Qualifications

Plaintiff advances two theories as to why he satisfied the lieutenant position's qualifications: (1) his VA disability status qualified him; and (2) he performed the duties of a GS-7 or GS-8 training office for more than a year, and thus should have received an SF-52 form allowing him to qualify for the position. [35] at 4–6. Because, according to Defendant, the VA did not hire Plaintiff because of his qualifications, or lack thereof, this Court considers both Plaintiff's qualifications and the question of pretext together.

### i. Plaintiff's Disabled Veteran Status Could Not, By Itself, Qualify Him For The Position

First, this Court cannot find that Plaintiff's VA disability status, by itself, qualified him for the lieutenant position. The job announcement clearly stated that current federal employee applicants holding a GS grade must meet a time-in-grade requirement of 52 weeks at the GS-7 level to be considered. [27] ¶ 24; [27-2] (Exhibit 14) at 3. The announcement also stated that the position required at least one year of specialized experience at the GS-7 level or the equivalent outside the VA, such as military law enforcement. [27] ¶ 24; [27-2] (Exhibit 14) at 2. It did encourage people with disabilities to apply, *see* [27-2] (Exhibit 14) at 1, but the VRA, 30 Percent, and

---

[7] Defendant also argues that Plaintiff failed to timely exhaust his GS-8 non-selection claim because he did not initiate contact with an EEO counselor within 45 days of learning of the VA's decision. [26] at 11. Because this Court denies Plaintiff's GS-8 non-selection claim on the merits, as discussed below, it need not consider this argument.

Schedule A—in addition to serving as discretionary authorities—all require applicants, at the very least, to meet a position's minimal qualifications. [27-2] (Exhibit 24) at 8-7–8-8.

Here, Plaintiff did indicate, in the questionnaire portion of his application, that he held a GS-7 position for 52 weeks, or that his current position constituted a grade above GS-7. [27] ¶ 27. But, Plaintiff also submitted his resume, official personnel file record, and October 2014 through September 2015 performance appraisal, all of which confirmed that although Hines had detailed him to training duties, at all times Plaintiff's official status remained at GS-6. [27] ¶ 28; [27-2] (Exhibit 17) at 1031, 1042, 1053 [27-2]. Further, Plaintiff's resume did not contain any outside "specialized experience" indicating he had performed GS-7 level work outside of the VA. *See generally* [27-2] (Exhibit 2). Because Plaintiff failed to meet the basic GS-7 time-in-grade and specialized experience requirements, his VA disability status could not, by itself, render him qualified.

### ii. Plaintiff Cannot Establish Pretext For His Disability-Based Qualification Argument

Even if Plaintiff could establish his qualifications by virtue of his VA disability status, and thus make out a prima facie case, Plaintiff still fails to establish pretext. Plaintiff cannot demonstrate that the VA, when it told Plaintiff he did not meet the lieutenant position's basic qualifications, used this reason as pretext for race-based discrimination. In examining pretext, the question "is whether the employer honestly believed its proffered reason for discharge." *Essex v. UPS*, 111 F.3d 1304, 1310 (7th Cir. 1997). The fact that an employer "was mistaken or based its decision on bad

policy, or even just plain stupidity, goes nowhere as evidence that the proffered explanation is pretextual." *Id.*

Here, Plaintiff first attempts to show pretext by citing evidence from another case his attorneys litigated against Defendant—*Henderson v. Shulkin*. Putting aside the suspect relevance of any evidence from that case, this Court must exclude it because, as discussed above, Plaintiff never produced or disclosed such evidence to Defendant before including it in his opposition memorandum. Plaintiff also cites generally to *Henderson v. Shulkin*, 720 Fed. Appx. 776 (7th Cir. 2017), in support of his pretext argument. [35] at 5. In *Henderson*, the Seventh Circuit found for the plaintiff in part because the employee hired instead of him, although VRA-eligible, "did not spend any time at the GS-9 level, which was required before he could be certified as eligible for a GS-11 level position under competitive hiring." *Id.* at 781. But an unrelated case—with different facts, individuals, and job announcements at issue—cannot serve as record evidence here that when the VA correctly followed its policy in this case, it did so pretextually.

As further evidence of pretext, Plaintiff argues that in 2014, Chief Marsh promoted Tylor Whitt—a Caucasian VA employee—to a different GS-8 supervisory police officer position using a non-competitive special appointing authority, even though Whitt had previously served as a GS-6 patrol officer. [35] at 4−5.[8] According

---

[8] Plaintiff's exhibits in support of this argument come from a different case litigated against Defendant—*Borja v. Shulkin*—in which Plaintiff's counsel challenged Whitt as the selectee. Plaintiff identified "documents related to *Borja v. Shulkin*" in his discovery responses, but did not identify which documents, out of the many documents exchanged in that case, Plaintiff believed contained relevant information. [41-2] (Exhibit 54) at 5. Therefore, Defendant argues that this Court should strike all evidence related to the *Borja* case under Rule 37(c)(1). This Court declines to do so, as Plaintiff did identify, although not in great detail, documents from *Borja* as relevant.

to Plaintiff, Whitt thus did not meet the time-in-grade requirement or have one year of specialized experience at the GS-7 level. *Id*. But unlike the position Plaintiff applied to in 2016, the 2014 announcement did not list a specific time-in-grade requirement in addition to a specialized experience requirement. *Id*. Instead, the 2014 announcement required only "one year of specialized experience at the [GS-7] or higher grade level or [outside] equivalent." [36-1] (Exhibit 16) at 3.

As examples of outside specialized experience at the GS-7 level, the VA lists, *inter alia*, working on a "medium to large, regular city" police force, military police force experience, and leadership experience. *Id*. Whitt previously served for six years in the U.S. Navy, where his work included: (1) supervising 30 sailors; (2) developing and facilitating anti-terrorism training measures and force protection security procedures; and (3) communicating with outside law enforcement agencies and reviewing threat assessments for upcoming foreign port visits in order to prepare security briefs. [36-1] (Exhibit 20) at 4−5. Further, Whitt also served on a Denver-based police force in a city of 130,000 people for one year. *Id*. at 4. Plaintiff, in contrast, served as a medical journeyman in the U.S. Air Force and had only three months of outside police-related experience as a border patrol agent trainee. [27-2] (Exhibit 2) at 3−4. Whitt, unlike Plaintiff, thus met the basic qualifications for his specific GS-8 position through outside specialized experience. As such, his promotion—to a different GS-8 position, in a completely different selection process— cannot serve as evidence of pretext or discriminatory intent in this case.

Finally, Plaintiff maintains that when he reached out to Dusenberry after his rejection, Dusenberry informed him that Hines would not consider Schedule A-qualified applicants for the position. [36] ¶ 15; [36-1] (Exhibit 6) at 49–50. According to Plaintiff, he then reached out to Chief Marsh, who told him that Schedule A and VRA applicants would be considered. [36] ¶ 15; [36-1] (Exhibit 1) ¶¶ 6–8. Plaintiff argues that this interaction demonstrates pretext, as the VA did not then issue a VRA or Schedule A certificate. [35] at 5. But, pretext "means something worse than a business error; pretext means deceit used to cover one's tracks." *Wells v. Unisource Worldwide, Inc.*, 289 F.3d 1001, 1006 (7th Cir. 2002). Absent additional evidence, Chief Marsh's remarks indicate, at most, potential confusion or mistake. *See Essex*, 111 F.3d at 1310 (The fact that an employer "was mistaken or based its decision on bad policy, or even just plain stupidity, goes nowhere as evidence that the proffered explanation is pretextual."). And regardless, as stated above, even if the VA did issue a VRA or Schedule A certificate, Plaintiff's VA disability status could not by itself render him qualified for the position.

Accordingly, this Court finds that Plaintiff presents insufficient evidence of pretext.

### iii.    SF-52 Form

Alternatively, Plaintiff seeks to establish the second element of a prima facie case—that he possessed sufficient qualifications for the lieutenant position—through the VA's SF-52 process. Plaintiff argues that because he performed the duties of a GS-7 or GS-8 training officer for more than a year, the VA should have given him a

SF-52 form that qualified him for the GS-8 lieutenant position. [35] at 5−6. In support, Plaintiff cites to an OPM guide, which states that details of 120 days or more should be documented "with an SF-52 showing the organization and *position*" to which the agency detailed the employee. [36-1] (Exhibit 5) at 14-A (emphasis added). But, Hines did not have an official GS-7 or GS-8 training officer position. [27] at 13. Certainly, the record reflects that Chief Marsh attempted to add such a position at Hines, and even submitted a proposed chain of command including that proposed new position. *Id.* at 14. But, the VA never approved this request. *Id.* Absent any law, regulation, or VA policy that requires Hines to have an official GS-7 or GS-8 training position, for which it can then issue SF-52 forms, this Court cannot find as a matter of law that Plaintiff's training detail entitled him to an SF-52 form qualifying him for the lieutenant position.

Moreover, even the VA did owe Plaintiff an SF-52 form, Plaintiff cannot establish that the VA's decision not to issue him an SF-52 form served as pretext for discrimination. Chief Marsh testified that he did not give Plaintiff an SF-52 form because: (1) the GS-7 or GS-8 training position did not exist, *id.* ¶ 18; [27-2] (Exhibit 4) at 98; and (2) Zomcheck prohibited him from providing SF-52 forms to his officers at that time, [27] ¶ 19. None of the other police officers who conducted training with Plaintiff received SF-52 forms indicating that they performed the duties of a higher-level position. *Id.* ¶ 21.[9] Certainly, creating a GS-7 or GS-8 training officer position

---

[9] Plaintiff notes that Joseph Ellena received an SF-52 form in April 2018. [36] ¶ 9; [36-1] (Exhibit 19) ¶ 4. But, the form detailed Ellena to a security specialist position that existed in the Hines chain of command, unlike the training officer position. [41-2] (Exhibit 47); [27-2] (Exhibit 9). The VA also issued Ellena's SF-52 after Zomcheck left Hines. [27-2] (Exhibit 4) at 5, 35.

may have been a prudent human resources decision. But, in determining pretext, this Court cannot "sit as a super-personnel department that reexamines an entity's business decisions." *Hudson Chi. Transit Auth.*, 375 F.3d 552, 561 (7th Cir. 2004) (quoting *Dale v. Chicago Tribune Co.*, 797 F.2d 458, 464 (7th Cir. 1986)). Instead, this Court must look to "whether the employer gave an honest explanation of its behavior." *Id*. (internal citations omitted). Here, Plaintiff offers no evidence indicating dishonesty on behalf of the VA and its SF-52 form practices. *See Malacara v. City of Madison*, 224 F.3d 727, 731 (7th Cir. 2000) ("An employer may hire or refuse to hire an employee for a good reason, a bad reason, a reason based on erroneous facts, or for no reason at all, as long as its action is not for discriminatory reason.") (internal quotations omitted). The VA's SF-52 form practices thus fail to create a triable issue as to pretext.

### b. Fourth Element: Selectees' Qualifications

Even if this Court could find Plaintiff qualified for the lieutenant position, Plaintiff must also show that the VA promoted someone outside of the protected class who was not better qualified for the position, or who had similar or lesser qualifications. *Riley*, 829 F.3d at 892; *Whitfield*, 755 F.3d at 444; *Pafford*, 148 F.3d at 669 (7th Cir. 1998). Plaintiff fails to meet this burden.

First, the VA's chosen candidate—James Gowdy—is an African American male, and thus within Plaintiff's protected class. [27] ¶¶ 34, 42. Second, after Plaintiff moved to Dallas, Marsh promoted another candidate to the GS-8 Lieutenant position—Jeromy Backman. *Id*. Backman is a Caucasian male, and thus outside of

Plaintiff's protected class. *Id*. Both Gowdy and Backman, however, submitted resumes indicating that they previously spent at least a year as GS-7 sergeants at Hines, thus meeting both the position's time-in-grade and specialized experience requirements. *Id*. ¶ 42. Accordingly, Gowdy and Backman possessed more, and better, qualifications than Plaintiff.

### c.    Plaintiff's GS-8 Non-Selection Claim Under *Ortiz*

Plaintiff's claim also fails under *Ortiz*'s holistic approach. Under *Ortiz*, this Court must assess Plaintiff's evidence cumulatively and determine whether it would permit "a reasonable factfinder to conclude" that the VA failed to promote Plaintiff because of his race. 834 F.3d at 765. This record, considered as a whole, does not allow this Court to do so.

Plaintiff provides no evidence to suggest any racial animus in the VA's decision-making process. The VA rejected five other applicants for failing to meet the time-in-grade requirement—two Caucasian, one African American individual, and one Hispanic. [27] ¶ 32. And of the seven applicants Dusenberry deemed qualified for the position—two Caucasian, three African-American, and one Hispanic—all submitted resumes indicating that they had previously spent at least one year at a GS-7 level or higher position. *Id*. ¶¶ 34, 36. Of the two candidates ultimately hired, one is an African-American individual with GS-7 level experience. *Id*. ¶¶ 34, 42.

Plaintiff correctly notes that a single instance of hiring an African-American employee "does not entitle [employers] to immunity from subsequent discrimination allegations." *Whitfield*, 755 F.3d at 444. Rather, courts must ask "whether the

plaintiff has established a logical reason to believe that the decision rests on a legally forbidden ground." *Carson v. Bethlehem Steel Corp.*, 82 F.3d 157, 159 (7th Cir. 1996). But here, aside from Plaintiff's race, the record contains no mention of race or race-related incidents throughout his entire career at the VA, much less the GS-8 hiring process; Plaintiff's belief that under Chief Marsh's tenure he "applied for multiple promotions but Chief Marsh chose less qualified Caucasian officers" cannot, without supporting evidence, create a genuine issue of material fact in this case. [36-1] (Exhibit 1) ¶ 4; *see also Johnson v. Nordstrom, Inc.*, 260 F.3d 727, 733 (7th Cir. 2001) (holding that plaintiff's "subjective belief that she was better qualified" cannot by itself raise a factual dispute).

The record also contains no evidence that, for example, Plaintiff's supervisors or coworkers harbored any racial animus or expressed any dislike for African-Americans. Plaintiff submitted a declaration from Thomas Johnson—an African-American officer at Hines Medical Center police—stating that many African-American employees call Hines "The Plantation" because of its long history of racial discrimination and retaliation. [36-1] (Exhibit 2) ¶ 2. But, such a general and conclusory statement cannot by itself create a genuine issue of material fact about the motivation for Plaintiff's non-selection in *this* case. *Cf. Baines v. Walgreen Co.*, 863 F.3d 656, 659 (7th Cir. 2017) (circumstantial evidence of animus toward black employee included manager's unusual decision to intervene in a decision not to rehire the employee, deviating from the employer's standard hiring procedures, a decision

to hire someone less qualified, and missing records of plaintiff's application and interview scores).

Because Plaintiff fails to connect his GS-8 lieutenant non-selection to his race, either through the *McDonnell Douglas* or *Ortiz* framework, this Court grants summary judgment to Defendant on his GS-8 lieutenant race-based discrimination claim (included in Count III).

### 2.     GS-7 Sergeant Non-Selection

With respect to Plaintiff's GS-7 sergeant non-selection claim, Defendant contends that Plaintiff cannot establish the fourth element of a prima facie case—that the VA promoted someone outside of his protected class who did not possess better qualifications for the position, or who had similar or lesser qualifications. [26] at 12; *Riley*, 829 F.3d at 892. Defendant also argues that even if Plaintiff could establish a prima facie case, he cannot show that the VA's proffered reason for his non-selection—that it chose more qualified individuals—serves as pretext for discrimination. [26] at 13.

In response, Plaintiff maintains that: (1) his qualifications are superior to the Caucasian individual chosen for the promotion, William Armstrong; (2) Defendant's failure to produce the underlying documents used to create the resume score sheets serves as evidence of pretext; and (3) the VA did not follow its own merit promotion policy in conducting its resume review, indicating pretext. [35] at 10−13.

For the reasons explained below, this Court agrees with Defendant.

### a. Armstrong Possessed Superior Qualifications For The Position

Plaintiff disputes only whether Armstrong, as opposed to the other two African-American candidates hired for the sergeant position, possessed superior qualifications. [35] at 12. According to Plaintiff, comparing his resume to Armstrong's resume reveals differences "so favorable to the plaintiff that there can be no dispute among reasonable persons of impartial judgment that the plaintiff was clearly better qualified for the position at issue." *Id.* (quoting *Mlynczak v. Bodman*, 442 F.3d 1050, 1059−60) (7th Cir. 2006). Not so.

Armstrong's application reveals the following facts about his background and experience: (1) a 3.8 college GPA; (2) a master's degree in public safety administration awarded in 2014, with a 4.0 GPA; (2) #2 ranking in his VA Academy class; (3) #1 ranking in his class at training for the Illinois Department of Corrections; (4) police supervision training coursework completed at Northwestern University; (5) various military awards and commendations; (6) five years as a U.S. Army military police officer, including experience as a Military Police Patrol supervisor; and (7) approximately three years of VA experience at the time of the announcement. [41-2] (Exhibit 49).

Plaintiff's application reveals the following facts about his background and experience: (1) a 2.75 college GPA; (2) a partially completed master's degree; (3) no listed VA academy ranking; (4) incomplete Border Patrol training coursework; (3) no listed police supervision training coursework; (5) no listed awards or commendations; (6) four years as a U.S. Air Force medical journeyman; and (7) approximately thirteen

years of VA experience at the time of the announcement. *Id.* (Exhibit 1 at 14−16); (Exhibit 29).

Based upon this record, this Court finds that no genuine issue of material fact exists as to which candidate possessed superior qualifications; Plaintiff had worked at the VA longer than Armstrong, but Armstrong demonstrated better college performance, a master's degree, police supervision training coursework, numerous military awards, and relevant military police and leadership experience. *See, e.g.*, *Sublett v. John Wiley & Sons, Inc.* 463 F.3d 731, 738 (7th Cir. 2006) (finding hired individuals more qualified than plaintiff because they, unlike plaintiff, had supervisory experience, as well as additional years of education); *Fisher v. Wayne Dalton Corp.*, 139 F.3d 1137 (7th Cir. 1998) (finding hired individual more qualified, despite plaintiff having greater seniority, because she had more extensive experience in inputting information); *cf. Fischer v. Avanade, Inc.*, 519 F.3d 393, 402 (7th Cir. 2008) (employer's reference to promoted individual's "exceptional" rating compared to Plaintiff's "exceeds expectations" rating was "insufficient to disprove that the individuals were similarly situated"). Thus, Plaintiff cannot establish a prima facie case of discrimination as to his GS-7 non-selection claim.

### b. Plaintiff Cannot Establish Pretext

Even if Plaintiff could make out a prima facie case of discrimination for the sergeant position, he cannot establish that the VA's reason for not hiring him—that he was less qualified than the chosen candidates—serves as pretext for discrimination.

The Seventh Circuit has held that:

> where an employer's proffered non-discriminatory reason for its employment decision is that it selected the most qualified candidate, evidence of the applicants' competing qualifications does not constitute evidence of pretext unless those differences are so favorable to the plaintiff that there can be no dispute among reasonable persons of impartial judgment that the plaintiff was clearly better qualified for the position at issue.

*Mylnczak*, 442 F.3d at 1059. Based upon the comparison of Armstrong and Plaintiff's applications above, this Court cannot find their competing qualifications sufficiently favorable to Plaintiff.

Plaintiff also argues that the absence of the individual score sheets written by each resume reviewer—as opposed to the total resume scoresheet indicating that Plaintiff tied for ninth place in the resume review—suggests pretext. [35] at 11. But to establish pretext, Plaintiff must show that the VA *lied* when it explained that it did not select Plaintiff after blind-grading resumes and placing him in ninth place. *Collins v. Am. Red Cross*, 715 F.3d 994, 1000 (7th Cir. 2013). Chief Marsh, Deputy Chief Jones, Wlodarski, and Gatterdam all offered declarations explaining the blind resume review, the score sheets, and their creation. [27-2] (Exhibits 5, 12, 30, 31). The panel members received the application materials with names and other identifying information redacted. *Id*. ¶ 48. Absent additional facts, this Court cannot find that the VA's failure to keep each panel member's handwritten, individual resume score sheets indicates that it lied about Plaintiff's ninth place finish.

As further evidence of pretext, Plaintiff repeatedly cites to the Seventh Circuit's opinion in *Henderson*, 720 Fed. Appx. 776, which made the following

comment about that plaintiff's selection process: "The record also calls into question the rigor of the selection process; the reviewers took no notes on their score sheet." *Id.* at 782. But the *Henderson* court made this statement within a different context, including the fact that the *Henderson* resume panel used inaccurate information, *id.*; here, neither party argues that the panel reviewed inaccurate resumes or applications.

Further, Plaintiff maintains that the VA failed to follow its own merit promotion policy, which requires hiring individuals to consider eight listed "sources of information" to the extent they relate to the relevant job post. [35] at 11−12; [36] ¶ 10. These sources include: (1) resume; (2) appraisals; (3) supplemental qualifications statement; (4) education; (5) awards; (6) training; (7) outside activities; (8) other tools: interviews, work samples, written tests, etc. *Id.*; [36-1] (Exhibit 4) at 21. Because Defendant failed to produce the underlying resume review score sheets, Plaintiff argues that no evidence exists to prove that the "8 areas of the mandatory merit promotion policy were considered." [35] at 12.

But, the policy does not mandate that each panelist must consider and rate each of the eight sources separately. Instead, the policy requires only that the panelist consider each source to the extent the applicant provides information related to that source. [36-1] (Exhibit 4) at 21 (applicants "are evaluated by comparing the total information on each applicant's capabilities against the quality levels for each rating factor"). [10] Nor must the panelists consider each source separately; the policy,

---

[10] As evidence of pretext, Plaintiff cites to Chief Marsh's deposition testimony—in a different case— that he could not recall any promotion that "follows this policy to the letter." [36-1] (Exhibit 22) at 98.

as an example, suggests that a reviewer might properly follow the policy by considering an applicant's experience resume, supervisory evaluation, education, training, and "other" relevant information. *Id*. at 22.

Here, the panelists provided declarations indicating that they did just that when evaluating the applications. Specifically, they looked for a number of factors, including "leadership experience (at the VA or elsewhere) that would prepare a candidate to serve as a GS-7 lead police officer," education, and "experience . . . and career highlights that demonstrated that the applicant was qualified for the position." [27-1] (Exhibit 5 ¶ 9); [27-1] (Exhibit 30) ¶ 6, [27-1]; (Exhibit 31) ¶ 7. And a comparison of Armstrong and Plaintiff's resumes, as discussed above, clearly demonstrates that Armstrong possessed superior experience, education, and training. In short, the absence of the underlying score sheets cannot establish that the panelists disregarded VA policy and thus discriminated against Plaintiff based upon race.

### c. Plaintiff's GS-7 Non-Selection Claim Under *Ortiz*

Plaintiff's sergeant non-selection claim also fails under *Ortiz*'s holistic approach. From the record before this Court, no reasonable factfinder could conclude that the VA failed to promote Plaintiff because of his race. 834 F.3d at 765. Ultimately, the VA selected three candidates for the position: two African-American individuals, and Armstrong, who is Caucasian. [27] ¶¶ 53, 55. And Plaintiff does not

---

But a review of the relevant testimony demonstrates that Chief Marsh meant he cannot recall a promotion that followed Plaintiff counsel's erroneous understanding of the policy "to the letter." *See id*. at 97–98 (Marsh explaining that if an applicant does not submit information applicable to one of the eight sources, then the panelists cannot consider that source).

appear to dispute the two African-American selectees' qualifications, instead arguing only that he had better qualifications than Armstrong. [35] at 12. Accordingly, this Court grants summary judgment to Defendant on his GS-7 sergeant race-based discrimination claim (included in Count III).

### C.    Plaintiff's Retaliation Claim

Count II alleges that the VA retaliated against Plaintiff in violation of Title VII when: (1) the VA—specifically Yenerall—refused to place Plaintiff on the GS-8 lieutenant certificate of eligible candidates despite his VA disability status; (2) Chief Marsh refused to issue an SF-52 form to Plaintiff; and (3) Turkoglu refused to send Plaintiff's required paperwork to the Dallas VA. [1] ¶¶ 54–64. Defendant moves for summary judgment as to Plaintiff's GS-8 lieutenant-related claims for the same reasons as Count III (Plaintiff's race discrimination claim). [26] at 6. Defendant also argues that Plaintiff made no effort to develop his paperwork retaliation claim, and thus waived this argument. [40] at 19–20. This Court agrees on both points.

To succeed on a Title VII retaliation claim, a plaintiff must show that his employer took a materially adverse action against him because he engaged in statutorily protected activity. *See Freelain v. Village of Oak Park*, 888 F.3d 895, 901 (7th Cir. 2018). The parties do not dispute that Plaintiff engaged in statutorily protected activity when he filed: (1) an EEO claim and lawsuit in 2008, before Marsh arrived at Hines; and (2) a 2015 EEO claim against Chief Marsh. *See* [27] ¶ 5–6.

When analyzing a Title VII retaliation claim, this Court must ask whether the record, as a whole, contains sufficient evidence to permit a reasonable factfinder to

conclude that retaliatory motive caused Plaintiff's non-selection. *See, e.g., Zegarra v. John Crane, Inc.*, 218 F. Supp. 3d 655, 671 (N.D. Ill. 2016). Here, Plaintiff's retaliation claim fails because his argument rests entirely upon the fact that Plaintiff filed an EEO claim against Chief Marsh in 2015, *see* [35] at 8; Plaintiff offers no other evidence to connect his prior protected activity to the lieutenant selection process. Moreover, Defendant also notes that Eddie Borja—a Hispanic applicant who had previously accused Chief Marsh and the VA of racial discrimination in an EEO claim—still made the lieutenant certificate, further disproving Plaintiff's retaliation claim for the same position. [27] ¶¶ 34−35. Absent any evidence tying Plaintiff's prior protected activity to the lieutenant selection process, no reasonable factfinder could conclude that the VA retaliated against Plaintiff when it: (1) refused to place him on the lieutenant certificate; and (2) declined to give him an SF-52 form.

And although Count II fails to mention retaliation with respect to Plaintiff's GS-7 non-selection, [1] ¶¶ 54−64, Plaintiff's response memorandum states, without explanation, that "Plaintiff has established a Discriminatory and Retaliatory Failure to Promote Claim for the GS-7 Sergeant Position." [35] at 10. This argument fails for the same reason as Plaintiff's GS-8 lieutenant retaliation claim: he fails to offer any evidence connecting his prior protected activity to the GS-7 selection process. Further, Defendant again notes that one of the African-American selectees for this position previously filed EEO claims and a lawsuit accusing Chief Marsh of discrimination, similarly undercutting Plaintiff's retaliation claim for the same position. [27] ¶¶ 55−56.

Finally, Plaintiff makes no effort to develop his argument that Turkoglu refused to send Plaintiff's required paperwork to Dallas in his response brief, *see generally* [35], and thus waives this argument. *See Crespo v. Colvin*, 824 F.3d 667, 674 (7th Cir. 2016).

Accordingly, this Court grants summary judgment to Defendant on Count II.

## IV. Conclusion

This Court grants Defendant's motion for summary judgment [25]. The Clerk shall enter judgment for Defendant and against Plaintiff. All dates and deadlines, including the trial date, are stricken. Civil case terminated.

Dated: May 9, 2019

Entered:

John Robert Blakey
United States District Judge